# WALTER MICKENS, JR.

v.

# COMMONWEALTH OF VIRGINIA

Record Nos. 931646 and 931647

April 15, 1994

Present: All the Justices

*Bryan L. Saunders (Warren F. Keeling,* on brief), for appellant.

*Robert Q. Harris, Assistant Attorney General (James S. Gilmore, III, Attorney General; Virginia B. Theisen, Assistant Attorney General,* on brief), for appellee.

JUSTICE STEPHENSON delivered the opinion of the Court.

In these appeals, we review a capital murder conviction and a death sentence imposed upon Walter Mickens, Jr., together with a conviction of attempted forcible sodomy.

# I

## PROCEEDINGS

In the first phase of a bifurcated jury trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury found Mickens guilty of the capital murder of Timothy Jason Hall, *i.e.,* the willful, deliberate, and premeditated killing of Hall in the commission of, or subsequent to, attempted forcible sodomy, in violation of Code § 18.2-31(5). The jury also found Mickens guilty of attempted forcible sodomy and fixed his punishment for that offense at 10 years' imprisonment.

In the second phase of the trial, the jury fixed Mickens' punishment at death for the capital murder of Hall, based upon both the "vileness" and the "future dangerousness" predicates. Code § 19.2-264.2. After considering a post-sentence report, prepared by a probation officer pursuant to Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury and entered judgments thereon.

We have consolidated the automatic review of Mickens' death sentence with his appeal of the capital murder conviction. Code § 17-110.1(F). By order entered November 12, 1993, Mickens' appeal of the attempted forcible sodomy conviction was certified from the Court of Appeals. Code § 17-116.06. We have consolidated that appeal with the capital murder appeal and have given both appeals priority on our docket. Code § 17-110.2.

# II

## THE CRIMES

Having prevailed at trial, the Commonwealth is entitled to have the evidence and all reasonable inferences deducible therefrom stated in the light most favorable to the Commonwealth. On March 28, 1992, Timothy Jason Hall, age 17, resided with 14-year-old Raheem Gordon and Gordon's father in an apartment located at 28th and Washington Streets in the City of Newport News. Hall and Gordon were roommates, and they often exchanged clothes, including shoes.

That day, between 7:00 and 8:00 p.m., Hall gave Gordon a ride, in Hall's automobile, to a party at the nearby Towers apartment building. At the time, Hall was wearing a pair of Gordon's Nike brand "Cross Trainer" tennis shoes. He also was wearing blue jeans and a shirt imprinted with either the word, "Duke," or the words, "Miami Hurricanes." Hall had intended to return to the party, but he never did. Neither Gordon nor his father ever saw Hall after that evening.

Vincent West and Bruce Mitchell also attended the party. About 8:00 p.m., they left the party and went to a nearby convenience store. After purchasing a few items and leaving the store, they sat in a park adjacent to the Towers apartment building. While sitting there, West and Mitchell saw a man with a bicycle, hiding in some bushes and looking at them. The man later was identified as the defendant, Mickens.

The following day, Gordon saw Hall's automobile. It was parked on West Avenue, near 28th Street, close to the Towers apartment building and in the same place it had been parked the previous night.

On March 30, 1992, about 12:30 p.m., Chris Basford was walking along the James River between 25th and 30th Streets when he saw a body beneath an abandoned construction company building. The body of a male Caucasian was lying face down on a mattress under a sheet of plywood. The body was nude from the waist down, except for white athletic socks, and its legs were spread apart approximately 12 inches. The victim was identified as Timothy Jason Hall.

Pubic hairs were recovered from the victim's buttocks. Bloody "transfer" stains were evident on the outsides of the victim's thighs, and a white liquid substance was observed close to the victim's anus.[1] Cigarette butts lying near the mattress also were recovered, and the mattress cover was seized for scientific examination. Nearby, the police found a pair of men's blue jeans and white underwear shorts that had washed up in the surf of the river. Gordon identified the clothes as those worn by Hall on the evening of March 28, 1992.

An autopsy revealed 143 separate "sharp force injuries" to the victim's body. Of the injuries, 62 were paired stab injuries that could have been caused by a multiple-blade knife, 13 were single stab wounds, and three were paired incised wounds.

The medical examiner who performed the autopsy concluded that the victim had bled to death and that 25 of the 143 wounds were fatal. The fatal wounds included four pairs of stab wounds that punctured the right lung, three single stab wounds that punctured the left lung, seven stab wounds to the skull that penetrated the brain, a stab wound to the forehead that also penetrated the brain, one pair of stab wounds that perforated the liver, and a pair of stab wounds to the right neck that severed the carotid artery and the jugular vein.

The medical examiner opined that the fatal wounds may not have caused instant death. Instead, she estimated that the victim could have

---

[1] Bloody "transfer" stains occur when an object comes into contact with blood and then contacts another surface, thereby leaving a stain on the other surface.

lived as long as 30 to 40 minutes after infliction of the last wound and that, during this time, the victim may have been conscious.

On the evening of April 4, 1992, the police were informed that a black male, wearing a blue and white jacket and riding a bicycle, had assaulted a juvenile. Responding to this information, Police Officer D.A. Seals and Detective Dallas Mitchell found Mickens riding a bicycle in the parking area of the abandoned construction company building.

Seals exited the police car, displayed his badge, and approached Mickens. Mickens, thereupon, fled on his bicycle. Shortly thereafter, Seals and Mitchell again came upon Mickens as he was being detained by other police officers. Mickens was arrested at 7:00 p.m. on the charges involving the juvenile.

Mickens agreed to talk with the police after being advised of his *Miranda* rights. Officer Mitchell told Mickens that he knew Mickens had killed Hall, but the officer did not tell Mickens how Hall had been murdered. In denying involvement in Hall's murder, Mickens said, "You didn't find any knife on me; did you?"

The following morning, warrants were obtained charging Mickens with Hall's murder and attempted sodomy. When Officer Seals handed Mickens copies of the warrants, Mickens said, "I accept the warrants, I accept the charges." Seals asked Mickens what was meant by that statement, and Mickens responded, "Mother f____r, if I told you I accept the warrants that means I'm guilty, don't it?"

On April 7, 1992, the police found Michael Jacobs wearing the Nike brand "Cross Trainer" tennis shoes that Hall had been wearing when Gordon had last seen Hall alive. Jacobs told the police that he had bought the shoes from Mickens for $5.00 the previous week.

An examination of the pubic hairs removed from Hall's buttocks revealed that they were from an African-American and were alike in "all identifiable microscopic characteristics" to the pubic hair sample taken from Mickens. The expert who examined the hairs further testified that the hairs could not have originated from Hall because he was a Caucasian. The witness also stated that tissue was attached at the roots of the hairs, indicating the hairs had been forcibly removed, possibly by the rubbing of the genitals against Hall's buttocks.

An examination of a stain found on the mattress cover revealed human sperm. Through DNA analysis (RFLP type)[2] of the sperm and of blood samples taken from Hall and Mickens, the expert determined

---

[2] For a detailed explanation of DNA print identification, see *Spencer* v. *Commonwealth,* 238 Va. 275, 286-89, 384 S.E.2d 775, 781-82 (1989), *cert. denied,* 493 U.S. 1036 (1990).

further that Mickens' DNA pattern matched the DNA pattern in the stain on the mattress cover. The witness also stated that the approximate percentages of the population that could have deposited the stain was one in 27,000 Caucasians, one in 6,000 African-Americans, and one in 2,000 Hispanics.

The cigarette butts and certain other hairs recovered at the crime scene also were subjected to DNA analysis (PCR type).[3] Both Hall and Mickens had D.Q. Alpha type 1.2, 4. The expert making the comparisons determined that Mickens could not be eliminated as the source of the hairs and of the saliva on the cigarette butts. Mickens smoked cigarettes, and Hall was never known to smoke cigarettes.

Tyrone Brister testified that, when he and Mickens shared a holding cell at the courthouse on March 26, 1993, he asked Mickens why he was in the cell. Mickens answered, "They said I stabbed somebody 140 something times in the head." Mickens then lowered his voice and said, "which I did." Mickens also told Brister that "they" said he also sodomized the victim and stole his sneakers. Again, Mickens lowered his voice and said, "which I did."

### III

### PRETRIAL MATTERS

### A

*Motion to Prohibit Imposition of Death Penalty*

Mickens filed and argued a pretrial motion to prohibit the imposition of the death penalty. In the motion, he advanced a number of arguments challenging the constitutionality of Virginia's death penalty scheme. The trial court overruled the motion as to each ground, and Mickens advances some of the same arguments on appeal.[4]

---

[3] For a detailed explanation of PCR DNA amplification, see *Spencer* v. *Commonwealth,* 240 Va. 78, 96, 393 S.E.2d 609, 620, *cert. denied,* 498 U.S. 908 (1990).

[4] In the nature of a "catch-all" assignment of error, Mickens makes the broad claim that the trial court erred in refusing to grant his pretrial motion to prohibit the imposition of the death penalty. He relies upon all the reasons stated in his appellate brief and in his trial memorandum in support of the motion. We will consider and decide each specific claim raised on appeal. If Mickens seeks to rely upon other grounds not specifically addressed on appeal, we will not consider them. " 'An appellant who asserts that a trial court's ruling was erroneous has an obligation to state clearly to the appellate court the grounds for that assertion. A cross-reference to arguments made at trial is insufficient.' " *Jenkins* v. *Commonwealth,* 244 Va. 445, 461, 423 S.E.2d 360, 370 (1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1862 (1993) (quoting *Spencer,* 240 Va. at 99, 393 S.E.2d at 622).

1

■ Mickens contends that the death penalty is unconstitutional *per se.* He argues that our society's standards of decency have evolved to the point that capital punishment no longer can be tolerated. To allow a state to impose the death penalty, he asserts, constitutes cruel and unusual punishment, in violation of the Eighth Amendment to the Federal Constitution. We have considered and rejected this contention in a number of cases. *See, e.g., Spencer* v. *Commonwealth,* 238 Va. 563, 568-69, 385 S.E.2d 850, 853 (1989), *cert. denied,* 493 U.S. 1093 (1990) (compiling cases). Adhering to our previous holding, we reject this contention.

■ Mickens also contends that the use of the electric chair as a method of carrying out the death penalty violates the prohibition against cruel and unusual punishment of the Federal and Virginia Constitutions. We previously rejected this contention in *Ramdass* v. *Commonwealth,* 246 Va. 413, 419, 437 S.E.2d 566, 569 (1993), and we reject it in the present case.

2

Mickens contends that the aggravating factors, set forth in Code § 19.2-264.4(C) as predicates for the imposition of the death penalty, are unconstitutionally vague. Code § 19.2-264.4(C) reads as follows:

> The penalty of death shall not be imposed unless the Commonwealth shall prove beyond a reasonable doubt that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society, or that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim.

With respect to the so-called "future dangerousness" predicate, Mickens claims that it is unconstitutionally vague because it permits a jury to find a "probability," based upon an accused's history or the circumstances of the offense, that an accused would commit acts of violence. Mickens asserts that the word, "probability," is ambiguous.

■ We rejected a similar contention in *Smith* v. *Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978), *cert. denied,* 441 U.S. 967 (1979). In *Smith,* we said that, if there is "a reasonable 'probability', *i.e.,* a likelihood substantially greater than a mere possibility," that an accused would commit violent acts in the future, "[s]uch a *probability* fairly supports the conclusion that society would be faced with a 'continuing serious threat'." Id. at 478, 248 S.E.2d at 149. (Emphasis added.) Thus, the word, "probability," in the statutory context in which it is used, is not ambiguous. Therefore, the "future dangerousness" predicate is not unconstitutionally vague.

Mickens also contends that the term, "aggravated battery to the victim," a component of the so-called "vileness" predicate, is unconstitutionally vague. In *Smith,* we construed the words, "aggravated battery," to mean "a battery which, qualitatively and quantitatively, is more culpable than the minimum necessary to accomplish an act of murder." Id. Since *Smith,* we have considered and rejected this contention on numerous occasions. *See, e.g., Stewart* v. *Commonwealth,* 245 Va. 222, 229, 427 S.E.2d 394, 399-400, *cert. denied,* ___ U.S. ___, 114 S.Ct. 143 (1993); *Satcher* v. *Commonwealth,* 244 Va. 220, 227, 421 S.E.2d 821, 826 (1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1319 (1993). Adhering to our previous holding, we reject Mickens' contention.

3

Mickens contends that Virginia's sentencing statutes are unconstitutional because they do not require a jury to find that the "aggravating circumstances outweigh mitigating ones." We do not agree.

The Federal Constitution does not require a sentencing body in a capital case to *weigh* aggravating factors against mitigating factors. *Zant* v. *Stephens,* 462 U.S. 862 (1983). In *Zant,* the Supreme Court rejected a claim that Georgia's capital sentencing statutes were unconstitutional because they required no weighing of aggravating and mitigating factors. Id. at 880.

■ Virginia juries must find at least one aggravating factor beyond a reasonable doubt before the death penalty can be imposed. However, juries remain at liberty to fix an accused's sentence at life imprisonment after considering all evidence in mitigation. *Smith,* 219 Va. at 472, 248 S.E.2d at 145. The Supreme Court has acknowledged that Virginia's statutory scheme for enforcing the death penalty is valid. *Stringer* v. *Black,* ___ U.S. ___, ___, 112 S.Ct. 1130, 1136 (1992).

■ We also reject Mickens' contention that the Constitution requires the granting of jury instructions defining mitigating evidence, specifying the burden of proof for such evidence, and specifying how jurors must consider such evidence. In rejecting this contention, we adhere to our previous holding. *See, e.g., Satcher,* 244 Va. at 228, 421 S.E.2d at 826; *Watkins* v. *Commonwealth,* 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), *cert. denied,* 475 U.S. 1099 (1986).

4

■ Mickens contends that the use of prior convictions, in the penalty phase of his trial, to establish future dangerousness violates the Double Jeopardy clause of the Fifth Amendment to the Federal Constitution. We do not agree. We previously have considered and rejected this contention, *see, e.g., Yeatts* v. *Commonwealth,* 242 Va. 121, 126, 410 S.E.2d 254, 258 (1991), *cert. denied,* ___ U.S. ___, 112 S.Ct. 1500 (1992); *Watkins* v. *Commonwealth,* 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), *cert. denied,* 494 U.S. 1074 (1990), and we again reject it.

5

■ Consistent with previous decisions, we reject Mickens' contention that an accused in a capital case is entitled to additional peremptory jury strikes. *See, e.g., Beavers* v. *Commonwealth,* 245 Va. 268, 273, 427 S.E.2d 411, 416, *cert. denied,* ___ U.S. ___, 114 S.Ct. 171 (1993); *Yeatts,* 242 Va. at 127, 410 S.E.2d at 258; *Quesinberry* v. *Commonwealth,* 241 Va. 364, 371, 402 S.E.2d 218, 223, *cert. denied,* 502 U.S. ___, 112 S.Ct. 113 (1991); *Buchanan* v. *Commonwealth,* 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), *cert. denied,* 493 U.S. 1063 (1990).

6

Mickens claims that Virginia's rule barring evidence about an accused's parole eligibility "prevents the jury from giving full consideration to all mitigating factors." He asserts that he would not have been eligible for parole and claims, without explanation, that the rule violates his federal and state constitutional rights.

■ We repeatedly have rejected this contention in capital cases. *See, e.g., Wright* v. *Commonwealth,* 245 Va. 177, 197, 427 S.E.2d 379, 392 (1993); *Mueller* v. *Commonwealth,* 244 Va. 386, 409, 422 S.E.2d 380, 394 (1992), *cert. denied,* ___ U.S. ___, 113 S.Ct. 1880 (1993); *King* v.

*Commonwealth,* 243 Va. 353, 367-68, 416 S.E.2d 669, 677, *cert. denied,* ___ U.S. ___, 113 S.Ct. 417 (1992); *Eaton v. Commonwealth,* 240 Va. 236, 248-49, 397 S.E.2d 385, 392-93 (1990), *cert. denied,* 502 U.S. ___, 112 S.Ct. 88 (1991). Accordingly, we adhere to our previous ruling and reject Mickens' contention.

### 7

Mickens claims that this Court fails to provide meaningful appellate review. We do not agree.

Mickens contends that we have failed to adopt a "harmless error" review procedure when a jury finds both aggravating factors.[5] We reject this contention for two reasons. First, Mickens assumes that the "vileness" predicate is unconstitutionally vague. For the reasons previously stated in Part III, A, 2 of this opinion, we uphold the validity of the "vileness" predicate. Second, the "harmless error" review is inapplicable because, as stated in Part III, A, 3 of this opinion, Virginia's statutory scheme for enforcing the death penalty does not require a weighing of aggravating and mitigating factors.

■ Mickens also contends that the statutorily mandated expedited review of death sentences denies him due process and equal protection. Mickens further contends that we have failed to conduct the proportionality review intended by the General Assembly. We reject Mickens' due process and equal protection contentions for the reasons stated in *Payne v. Commonwealth,* 233 Va. 460, 473-74, 357 S.E.2d 500, 508-09, *cert. denied,* 484 U.S. 933 (1987). Mickens' remaining argument is meritless. *See, e.g., Satcher,* 244 Va. at 228, 421 S.E.2d at 826; *Stockton v. Commonwealth,* 241 Va. 192, 215-16, 402 S.E.2d 196, 210, *cert. denied,* 502 U.S. ___, 112 S.Ct. 280 (1991); *Smith v. Commonwealth,* 239 Va. 243, 253, 389 S.E.2d 871, 876, *cert. denied,* 498 U.S. 881 (1990).[6]

### B

*Statement Made by Mickens to the Police*

Mickens filed a pretrial motion to suppress statements he had made to the police, contending that the statements "were not freely and vol-

---

[5] Pursuant to a "harmless error" review, a state appellate court, when the sentencer has been instructed to consider an invalid factor, must determine what the sentencer would have done absent such factor. *Stringer,* ___ U.S. at ___, 112 S.Ct. at 1136-37.

[6] Mickens also contends he was denied effective assistance of counsel because his time to prepare his appeal was limited by the statutorily mandated expedited review. We reject this contention as meritless.

untarily made and were obtained in violation of [his] rights under the 4th, 5th and 14th Amendments to the U.S. Constitution." After conducting an evidentiary hearing, the trial court denied the motion, and Mickens has assigned error to the ruling.

As previously noted, on April 4, 1992, the police detained Mickens about 6:35 p.m. and arrested him at 7:00 p.m. on the charges involving the juvenile. At that time, Mickens was advised of his *Miranda* rights.

Mickens then was taken to the police station. At 7:30 p.m., he was placed in an interview room, and, at 8:08 p.m., Officer Coleman entered the room and asked Mickens his name and address. After obtaining that information, Coleman left the room. No one else entered the interview room until 11:20 p.m., and, at that time, Mickens was taken before a magistrate.

Detective Mitchell questioned Mickens from 12:05 a.m. until 3:30 a.m., a period of only slightly more than two hours because of the change from Standard time to Daylight Savings time. During this period, a 15-minute break was taken at 1:15 a.m., during which time Mickens drank some water.

According to Mitchell, Mickens became very "emotional" and "started sweating real bad" when informed that evidence obtained at the crime scene was being subjected to DNA analysis. Mitchell told Mickens that he knew Mickens had killed Hall, but Mitchell did not mention a knife or how Hall had been murdered. Nevertheless, Mickens volunteered, "You didn't find any knife on me; did you?" At no time during the interview by Mitchell did Mickens request a lawyer, and Mickens appeared to understand what transpired.

At 4:10 a.m., on April 5, 1992, the police took Mickens to Riverside Hospital so that physical evidence could be recovered for laboratory analysis. At 6:30 a.m., Mickens was taken to jail, and, at 7:25 a.m., he was taken from jail to the police station, arriving there at 7:55 a.m.

Officer Coleman again interviewed Mickens from 7:55 a.m. until 9:30 a.m. Mickens told Coleman that he remembered his rights. Mickens also said, "[I]f you think you're going to get me to implicate myself in these murders, you're crazy."

At 9:30 a.m., Officer Seals again advised Mickens of his *Miranda* rights and of the charges in the warrants. Mickens put his fingers in his ears and rocked back and forth. As we have said, when Seals handed Mickens copies of the warrants, Mickens said, "I accept the warrants, I accept the charges." When Seals asked Mickens what was meant by that statement, Mickens responded, "Mother f____r, if I told you I accept the warrants that means I'm guilty, don't it?" At 9:41

a.m., Mickens told Seals that he wanted to go to jail, and the interview was terminated.

At the suppression hearing, Mickens testified that, to his knowledge, he was not advised of his *Miranda* rights. He said he asked the officers to leave him alone, but they refused. He testified further that he asked the police whether he had a right to an attorney and that he was told the police needed to ask him more questions.

On appeal, Mickens contends that his statements to the police were not made voluntarily. Whether a waiver of *Miranda* rights was made knowingly and intelligently is a question of fact. A trial court's resolution of the question is presumed to be correct and will not be disturbed on appeal unless plainly wrong. *Harrison v. Commonwealth,* 244 Va. 576, 581, 423 S.E.2d 160, 163 (1992); *Watkins,* 229 Va. at 477, 331 S.E.2d at 429-30.

The Commonwealth must prove by a preponderance of the evidence that an accused's statement was voluntary. *Williams v. Commonwealth,* 234 Va. 168, 172, 360 S.E.2d 361, 364 (1987), *cert. denied,* 484 U.S. 1020 (1988). Although the voluntariness of a statement is a legal determination, subsidiary factual questions are entitled to a presumption of correctness. *Id.; Miller v. Fenton,* 474 U.S. 104, 110-12 (1985). In determining whether an accused's will has been overborne, a court must look at the totality of the surrounding circumstances, including the accused's background and experience and the conduct of the police. *Gray v. Commonwealth,* 233 Va. 313, 324, 356 S.E.2d 157, 163, *cert. denied,* 484 U.S. 873 (1987).

In the present case, the trial court found that Mickens had been advised of his *Miranda* rights, that he knowingly and intelligently waived his rights, and that he, at no time, requested an attorney or even talked about an attorney. The court further found that his statements to the police were given knowingly, voluntarily, and freely.

We conclude that the record fully supports the trial court's findings and ruling. Accordingly, we hold that the trial court did not err in denying the motion to suppress.

## IV

### GUILT PHASE

#### A

*Photographs of Victim's Body.*

Mickens contends that the trial court erred in admitting into evidence five photographs of the victim's body. He asserts that the court

abused its discretion because the Commonwealth had presented the medical examiner's testimony about the victim's injuries. In overruling Mickens' objection to the admission of the photographs, the trial court noted that the photographs were "relevant and not duplicative."

We have ruled time and again, and Mickens concedes, that the admission into evidence of photographs is a matter resting within a trial court's sound discretion. *See, e.g., Gray,* 233 Va. at 342-43, 356 S.E.2d at 173 (compiling cases). Photographs of a victim that tend to show motive, intent, method, premeditation, malice, or the degree of atrociousness of the crime are relevant. *Id.* Photographs, even though gruesome, are admissible, provided they accurately portray what an accused did in committing an offense. *Id.*

▮ In the present case, the photographs tended to establish motive, intent, method, premeditation, malice, and atrociousness of the crime and, therefore, were relevant. The pictures, although graphic, accurately portrayed what Mickens had done. Therefore, we hold that the trial court did not abuse its discretion in admitting into evidence the photographs of the victim's body.

### B

#### *Sufficiency of the Evidence*

Mickens claims that the evidence is insufficient to prove that he is guilty of either attempted forcible sodomy or capital murder. He contends that the Commonwealth failed to prove that he "intended to commit forcible sodomy or that he did any act towards the commission of the act that amounted to the commencement of the act." He further contends that the Commonwealth failed to prove that he was the criminal agent in Hall's death. We reject both contentions.

▮ When an accused challenges the sufficiency of the evidence on appeal, we must view the evidence and all fair and reasonable inferences deducible therefrom in the light most favorable to the Commonwealth. *Wright,* 245 Va. at 192, 427 S.E.2d at 389. We must affirm the trial court's judgment unless it is plainly wrong or without evidence to support it. *Id.*

▮ In order to establish an attempted crime, the Commonwealth must prove (1) an intent to commit the crime; and (2) a direct, but ineffectual, act toward its accomplishment amounting to the commencement of the consummation of the crime. *Barrett* v. *Commonwealth,* 210 Va. 153, 156, 169 S.E.2d 449, 451 (1969). Intent is a state of mind that may be established by an accused's conduct or statements and may be, and frequently is, proved by circumstantial evidence. *Id.* The act toward accomplishment of the crime need not be

the last proximate act to the consummation of the contemplated crime. *Granberry v. Commonwealth,* 184 Va. 674, 678, 36 S.E.2d 547, 548 (1946).

In the present case, the circumstantial evidence clearly established the requisite elements of attempted forcible sodomy. Hall's body, naked from the waist down, was found lying face down on a mattress under an abandoned building. His legs were spread apart 12 inches. A white lubricant was on Hall's buttocks near his anus. African-American pubic hairs found on Hall's buttocks were like Mickens' pubic hairs in "all identifiable microscopic characteristics." Tissue attached to the roots of the hairs, indicating that the hairs had been forcibly removed, was consistent with Mickens' having rubbed his genitals against Hall's buttocks. Bloody "transfer" stains were evident on Hall's thighs, and a semen stain found on the mattress cover was consistent with Mickens' DNA pattern. Additionally, Mickens' statements to Officer Seals and to Tyrone Brister confirmed that Mickens had attempted to commit forcible sodomy.

 Unquestionably, the evidence supports the finding that Mickens was the criminal agent in Hall's death. In addition to the circumstantial evidence and the statements mentioned above, the evidence showed that Mickens was seen attempting to hide in bushes near Hall's residence shortly before Hall disappeared. Most significantly, the Commonwealth proved that Mickens sold to Michael Jacobs the tennis shoes that Hall was wearing when he was last seen alive. Additionally, Mickens' saliva was consistent with that found on cigarette butts recovered at the crime scene.

We conclude, therefore, that the evidence is sufficient to prove beyond a reasonable doubt that Mickens is guilty of attempted forcible sodomy and capital murder, as defined by Code § 18.2-31(5).

## V

## PENALTY PHASE AND SENTENCE REVIEW

### A

*Facts*

In the penalty phase of the trial, the Commonwealth proved that Mickens had been convicted of six prior felonies. The convictions are summarized as follows:

| Date | Offense | Punishment |
|------|---------|-----------|
| March 16, 1973 | Attempted larceny from the person | 3 years' imprisonment |
| June 3, 1974 | Sodomy | 3 years' imprisonment |
| June 3, 1974 | Robbery | 6 years' imprisonment |
| June 3, 1974 | Grand larceny from the person | 4 years' imprisonment |
| February 4, 1980 | Sodomy | 10 years' imprisonment |
| February 4, 1980 | Robbery | 7 years' imprisonment |

Mickens' probation and parole officer testified that Mickens had been paroled three times: On October 30, 1973, on July 1, 1979, and on December 19, 1991. On two prior occasions, Mickens' parole had been revoked, and he was on parole when Hall was murdered. During his most recent parole, Mickens never missed an appointment with the parole officer, and he was looking for work.

Charles Siron testified that, on February 14, 1974, he and Mickens were incarcerated in the Newport News City Jail. While Siron was asleep in his bunk, Mickens put a razor blade to Sirons' throat, forced him into the shower area, and sodomized him.

Ruby Bunn, an elementary school teacher, testified that, on February 7, 1974, Mickens entered her classroom carrying a knife and demanded money. Bunn went to get money from her purse, and, when she looked up, she saw Mickens holding the knife approximately three inches from a small boy. Bunn gave Mickens her money, and Mickens fled.

Mickens presented the testimony of four witnesses. Sarah Catherine Johnson, Mickens' long-time friend, testified that, after Mickens had been released from prison the last time, "[h]e was very nice, very pleasant." She said she "saw nothing bad about [Mickens]" and that he was "more like a Christian or church-going person."

Mary Brown, Mickens' aunt, testified that, when Mickens was a young boy, she sometimes would "baby-sit" him. She said he was an obedient child and never gave her any problems. When Mickens became a teenager, he began to have some problems, but "nothing bad-bad."

Darlene Mickens, the defendant's sister, testified that the family was "very close." She said that Mickens stopped going to school when he was in the ninth grade. She stated that her daughter played games with Mickens and "adored" him. Mickens never gave his sister any trouble.

Catherine Mickens, the defendant's mother, testified that Mickens was born on October 19, 1954 and that his father left the home about 1956. She described her son as a "very kindhearted person" and stated that her son was never mean to anybody and had never been a problem to her. When Mickens was a teenager he "started sniffing glue." She stated that her son was "slow at school."

Mickens described himself as a slow learner. He said he began getting into trouble as a juvenile, and his problems worsened when he began to sniff glue and paint. He also stated: "I would like the jury to know that I did not willfully, intently [sic] or no kind of way kill Mr. Hall."

## B

*Sentence Review under Code § 17-110.1*

Pursuant to Code § 17-110.1, we are required to review Mickens' death sentence on the record. In making the review, we must consider and determine the following:

1. Whether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor; and

2. Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

In claiming that the death sentence was imposed under the influence of passion, prejudice, or other arbitrary factors, Mickens directs our attention to only two matters. First, Mickens complains about a statement made by the Commonwealth's Attorney in closing argument. However, no objection to the statement was made at trial. Therefore, we will not consider this complaint on appeal. Rule 5:25. The second matter pertains to the photographs of the victim's body.

For the reasons previously stated in Part IV, A of this opinion, we uphold the admissibility of the photographs.

 Our review of the record does not reveal anything to support a finding that the jury, in imposing the death sentence, was influenced by passion, prejudice, or any other arbitrary factor. It would serve no useful purpose to repeat our summary of the facts surrounding the commission of the crime and Mickens' criminal record. Suffice it to say that the evidence supports the jury's finding that Mickens' conduct in committing the crime was outrageously and wantonly vile, horrible, and inhuman in that it involved aggravated battery to Hall. The evidence also supports the jury's finding that, based upon Mickens' prior history and the circumstances surrounding the commission of the offense against Hall, Mickens would commit criminal acts of violence that would constitute a continuing serious threat to society.

 In making the proportionality review, we must "determine whether other sentencing bodies in this jurisdiction generally impose the supreme penalty for comparable or similar crimes, considering both the crime and the defendant." *Jenkins,* 244 Va. at 461, 423 S.E.2d at 371; Code § 17-110.1(C)(2). In discharging this duty, we have compiled and examined the records of all capital murder cases reviewed by this Court, Code § 17-110.1(E), giving special attention to the cases where the death penalty was based on both the "vileness" and "future dangerousness" predicates. From this review, we conclude that Mickens' death sentence is not excessive or disproportionate to penalties generally imposed by other sentencing bodies in the Commonwealth. *See, e.g., Spencer* v. *Commonwealth,* 238 Va. 295, 318-20, 384 S.E.2d 785, 799-800 (1989), *cert. denied,* 493 U.S. 1093 (1990) (compiling cases).

## VI

## CONCLUSION

We find no reversible error in the trial court's judgments. After reviewing the death sentence as required by Code § 17-110.1, we conclude that the capital murder conviction and the sentence imposed should be affirmed. Therefore, we will affirm the judgments.

Record No. 931646 - *Affirmed.*
Record No. 931647 - *Affirmed.*